**William R. BEARD, Jr.,**
**Plaintiff-Appellee,**

**v.**

**Gary J. LIVESAY, Warden; Robert Davies, Acting Warden; and Evans Fine, Director of Offender Classification, Defendants-Appellants.**

**No. 85–5730.**

United States Court of Appeals,
Sixth Circuit.

Argued June 9, 1986.

Decided July 18, 1986.

---

Wayne E. Uhl (argued), Asst. Atty. Gen., Nashville, Tenn., for defendants-appellants.

Susan L. Kay (argued), Vanderbilt Legal Clinic, Vanderbilt Law School, Nashville, Tenn., for plaintiff-appellee.

Before MARTIN and GUY, Circuit Judges, and BROWN, Senior Circuit Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

The defendants, prison officials of the state of Tennessee, appeal the district court's grant of summary judgment to the plaintiff prisoner, William Beard. The district court held that under Tennessee statutes and regulations the reclassification of a prison inmate from minimum to medium security without a hearing implicated a protectible liberty interest under the fourteenth amendment. The court ordered the prison officials to expunge from Beard's record all references to his transfer and reclassification, but denied his requests for restoration of his Prison Performance Sentence Credits and an injunction covering all inmates within the Tennessee prison system. Beard was also awarded attorney's fees and costs. The prison officials appeal

from this order; Beard did not file a cross-appeal.

In March of 1980 Beard began serving a ten-year sentence at Bledsoe County, Tennessee Regional Correctional Facility, where he was initially classified as a medium security prisoner. Beard was reclassified as a "minimum-direct" security prisoner in March 1981. He was still not allowed to work outside the prison, but he received fifteen days of Prison Performance Sentence Credit per month as a result of this reclassification, instead of the ten days of credit per month he received as a medium security prisoner. Prison Performance Sentence Credit may reduce the prison time that must be served before a prisoner's parole and eventual release.

In August, 1981, Beard and another inmate became involved in an altercation, and the prison authorities feared further internal security problems. Both Beard and his assailant were transferred to other prisons within the Tennessee system.

Beard was moved to Tennessee's Brushy Mountain Prison pursuant to an administrative transfer. Brushy is a medium security prison. Upon his transfer, Beard was immediately reclassified from minimum to medium security in order to fit the security designation of the institution. No hearing was held before or after this reclassification. As a medium security prisoner, Beard could earn a maximum of ten PPSC days per month. Beard does not challenge the validity of the administrative transfer, but argues that his reclassification without a hearing violated his liberty interest in his security status.

The issues presented on appeal are whether the Tennessee reclassification system creates a protectible interest in an inmate's security status and whether expungement of the plaintiff's reclassification records was an appropriate remedy.[1]

■ A liberty interest protectible under the fourteenth amendment may arise only when implicated by the Constitution, or a state law or regulation. *Hewitt v. Helms,* 459 U.S. 460, 469, 103 S.Ct. 864, 870, 74 L.Ed.2d 675 (1983); *Meachum v. Fano,* 427 U.S. 215, 226, 96 S.Ct. 2532, 2539, 49 L.Ed.2d 451 (1976). A prisoner has no inherent constitutional right to be housed in a particular institution, *Meachum,* 427 U.S. at 224, 96 S.Ct. at 2538 or to enjoy a particular security classification. *Moody v. Daggett,* 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976); *Montanye v. Haynes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). Therefore, any liberty interest which exists in Tennessee's reclassification process must be created by the state.

■ A state, by its own actions, may create liberty interests protected by the due process clause. *Hewitt,* 459 U.S. at 469, 103 S.Ct. at 870; *Bills v. Henderson,* 631 F.2d 1287, 1291 (6th Cir.1980). The Supreme Court described when the action of a state will create such an interest in *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983):

These cases demonstrate that a State creates a protected liberty interest by placing substantive limitations on official discretion. An inmate must show 'that particularized standards or criteria guide the State's decisionmakers.' *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 467 [101 S.Ct. 2460, 2465, 69 L.Ed.2d 138] (1981) (BRENNAN, J., concurring). If the decisionmaker is not 'required to base its decisions on objective and defined criteria,' but instead 'can deny the requested relief for any constitutionally permissible reason or for no reason at all,' *ibid.,* the State has not created a constitutionally protected liberty interest. See *id.,* at 466–467 [101 S.Ct. at 2465] (opinion of the Court); see also *Vitek v. Jones,* 445 U.S. [480], at 488–491 [100 S.Ct. 1254, at 1261–1262, 63 L.Ed.2d 552 (1980)] (summarizing cases).

---

1. Beard concedes on appeal that that portion of the district court's judgment ordering expungement of his transfer records was in error, as he does not challenge the transfer itself but only the reclassification.

■ Prison officials may also create liberty interests by policy statements, regulations, or other official promulgations. *Walker v. Hughes,* 558 F.2d 1247, 1255 (6th Cir.1977). The plaintiffs, however, must have "a legitimate claim of entitlement to the interest, not merely a unilateral expectation of it." *Bills,* 631 F.2d at 1292. The criteria for making this determination are explained in *Bills,* 631 F.2d at 1292–93.

Where statutes or prison policy statements have limited prison officials' discretion by imposing a specific prerequisite to the forfeiture of benefits or favorable living conditions enjoyed by a prisoner, an expectation or entitlement has been created which cannot be taken away without affording the prisoner certain due process rights. On the other hand, when prison officials have complete discretion in making a decision that will affect the inmate, no expectation or protected liberty interest has been created.

Similar analysis was employed in the Supreme Court's *Hewitt* decision, which held that under applicable Pennsylvania statutes and regulations, a prisoner's transfer from a general prison population to administrative segregation implicated a protected liberty interest.[2] The *Hewitt* court first made clear that procedural requirements alone cannot establish a liberty interest:

The creation of procedural guidelines to channel the decisionmaking of prison officials is, in the view of many experts in the field, a salutary development. It would be ironic to hold that when a State embarks on such desirable experimentation it thereby opens the door to scrutiny by the federal courts, while States that choose not to adopt such procedural provisions entirely avoid the strictures of the Due Process Clause. The adoption of such procedural guidelines, without more, suggests that is these restrictions alone, and not those federal courts might also impose under the Fourteenth Amendment, that the State chose to require.

*Hewitt,* 459 U.S. at 471, 103 S.Ct. at 871. *See also Naegele Outdoor Advertising v. Moulton,* 773 F.2d 692, 703 (6th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1639, 90 L.Ed.2d 184 (1986); *Bills,* 631 F.2d at 1298–99.

■ Clearly, therefore, Tennessee's requirement that a hearing be held prior to any reclassification cannot in itself create a protectible liberty interest. However, if Tennessee has gone beyond procedural guidelines by using "mandatory language" in connection with "specific substantive predicates," a liberty interest may be found. *Hewitt,* 459 U.S. at 472, 103 S.Ct. at 871. *Compare Pugliese v. Nelson,* 617

---

2. The Court found a liberty interest implicated by the following Pennsylvania statutes and regulation:

Title 37 Pa.Code § 95.104(b)(1) (1978) provides:
An inmate who has allegedly committed a Class I Misconduct may be placed in close or Maximum Administrative Custody upon approval of the officer in charge of the institution, not routinely but based upon his assessment of the situation and the need for control pending application of procedures under § 95.103 of this title.

Section 95.104(b)(3) of the same Title provides:
An inmate may be temporarily confined to Close or Maximum Administrative Custody in an investigation status upon approval of the officer in charge of the institution where it has been determined that there is a threat of a serious disturbance, or a serious threat to the individual or others. The inmate shall be notified in writing as soon as possible that he is under investigation and that he will receive a hearing if any disciplinary action is being considered after the investigation is completed. An investigation shall begin immediately to determine whether or not a behavior violation has occurred. If no behavior violation has occurred, the inmate must be released as soon as the reason for the security concern has abated but in all cases within ten days.

Finally, a State Bureau of Correction Administrative Directive states that when the State Police have been summoned to an institution:
Pending arrival of the State Police, the institutional representative shall:
1. Place all suspects and resident witnesses or complainants in such custody, protective or otherwise, as may be necessary to maintain security. A hearing complying with [37 Pa. Code § 95.103 (1972)] will be carried out after the investigation period. Such hearing shall be held within four (4) days unless the investigation warrants delay and in that case as soon as possible.

Pa.Admin.Div. BC–ADM 004, § IV(B) (1975).

F.2d 916 (2d Cir.1980) (administrative policy statement held not to create liberty interest because it merely established procedures rather than limiting discretion).

An examination of the statutes and regulation at issue in *Hewitt* is instructive. These pronouncements are arguably quite precatory, yet the Supreme Court held that the use of mandatory language and the requirement of substantive predicates in the procedural regulations themselves ("the need for control," or "the threat of serious disturbance") supported a conclusion that the state had established a protected liberty interest. *See also Olim v. Wakinekona,* 461 U.S. at 249, 103 S.Ct. at 1747 ("A State creates a protected liberty interest by placing substantive limitations on official discretion.")

The Tennessee statutes and regulations governing reclassification are more mandatory in nature than the corresponding promulgations in *Hewitt.* The Tennessee statute provides: "The prisoners shall be graded and classified in such manner as shall be most conducive to prison discipline and the moral status of the prisoner." Tenn.Code Ann. § 41–21–202. Further, Tennessee regulations regarding reclassification provide:

> Residents assigned to a particular security cannot be classified/reclassified to a facility outside of the receiving institution's security range, e.g. residents assigned close security cannot be reclassified to Turney Center. In order for this [sic] resident to be sent to Turney Center, his security status must not be greater than medium, obviously a resident must merit a reduction in security before being reclassified to a facility with a lesser security range.

Policies of the Department of Correction, Index 404.00.

Tennessee has also adopted elaborate procedures for the reclassification process which further limit prison official's discretion.[3] These regulations require a hearing

prior to any reclassification, which must be held by a specifically composed committee. This committee "in joint consideration with the subject inmate and on the basis of information received from all available sources, assesses and assigns the inmate, or recommends such assignments." Policies of the Department of Corrections, Index 401.02(IV)(C). The Program Review Board is specifically charged with reviewing transfer reclassifications. Index 401.-02(VI)(A)(4)(b). Further, and equally important, "[a] reclassification hearing shall be scheduled before an appropriate panel of the classification committee, whenever any one of the following circumstances applies: ... The inmate's current security designation is not appropriate to his/her current institution assignment." 401.-04(VI)(C) & (11). Beard's situation was therefore specifically addressed in the Department's own policies.

While procedural safeguards alone cannot create a protectible liberty interest, these very detailed procedures, together with the substantive limitation that an inmate merit a reduction or enhancement of security designation, defined as that which is "most conducive to prison discipline and the moral status of the prisoner" are sufficient to create a protectible liberty interest.

A similar argument has been raised before the Seventh Circuit. In *Matthews v. Fairman,* 779 F.2d 409 (7th Cir.1985), the court held that the Illinois administrative regulation governing prison reassignments established only procedural guidelines governing those reassignments and therefore did not create a protectible liberty interest for purposes of the fourteenth amendment. Matthews was transferred from a medium to a maximum security unit without meriting or receiving a corresponding increase in security classification. Under Illinois administrative regulation 802(11)(C), "a change in assignment may be made for three reasons only: (1) the inmate's inability or incompetence in completing a work,

---

**3.** The detail evident in these reclassification procedures is not surprising, given that the original classification of a prisoner is a serious under-

taking which takes about six weeks. *See Grubbs v. Bradley,* 552 F.Supp. 1052, 1060–65 (M.D. Tenn.1982).

training, or study assignment; (2) an inmate's violation of a rule after the inmate has been adjudged guilty in accordance with the provisions of A.R. 804 (governing the administration of discipline); or (3) placement in segregation under the provisions of A.R. 804." *Matthews*, 779 F.2d at 412. Matthews argued that A.R. 802(11)(C) limited prison officials' discretion in assignment, creating a protected liberty interest under the precepts of *Hewitt v. Helms.*

The *Matthews* court rejected the prisoner's argument, relying heavily on the fact that Matthews could point to no Illinois *statute* restricting officials' discretion in reassigning an inmate. *Matthews*, 779 F.2d at 414. According to the *Matthews* court, an administrative regulation standing alone cannot create a protected liberty interest. *Id.*

The Sixth Circuit has specifically rejected this reasoning. In *Mayes v. Trammell,* 751 F.2d 175 (6th Cir.1984), the Court found a liberty interest to exist in the Tennessee parole scheme, although the Tennessee parole statute contained none of the required mandatory language. The Court held "although the parole statute itself certainly does not create a liberty interest, we hold that the overall Tennessee parole scheme, particularly Rule 1100–1–1–.06 of the Rules of Tennessee Board of Parole, does create an entitlement protected by the due process clause. *The presence of the decisive language in the Board's rules, rather than in the statute, does not diminish its significance. See Bills v. Henderson,* 631 F.2d at 1291; *Walker v. Hughes,* 558 F.2d at 1255." [emphasis added]. In addition, the mandatory language in *Hewitt* is contained in the *procedural* provisions of the Pennsylvania statute and the relevant Bureau of Correction Administrative Directive. For these reasons, we do not find the *Matthews* analysis to be persuasive in the present context.[4]

In sum, where substantive limitations have in fact been placed on the discretion of prison officials in classifying inmate's security status, a protectible liberty interest has been created. *Meachum,* 427 U.S. at 228, 96 S.Ct. at 2540. Tennessee has combined the explicitly mandatory language required by *Hewitt* with detailed procedures governing reclassification. We believe that this combination sufficiently restrains officials' actions to give rise to an expectation on the part of Tennessee prisoners that they will not be arbitrarily reclassified.

Mindful of the discretion to be afforded prison officials in matters of discipline, it bears repeating that Beard does not challenge the warden's right to transfer him to another institution for any reason, or no reason at all. His contention is limited to Tennessee's reclassification procedures, and it is these provisions alone which we hold implicate a liberty interest under the fourteenth amendment.

Once a liberty interest has been found to exist, the next step is to determine what process is due the holder of this interest. Beard concedes that in this instance, the panoply of procedural rights afforded prisoners subject to reclassification in the Tennessee system satisfies the requirements of due process under the fourteenth amendment. We agree. While the process due and the process afforded will not always be identical, *see Bills,* 631 F.2d at 1296–99, we believe that Tennessee has adequately safeguarded prisoners' rights upon their reclassification. Thus, if Beard had in fact received the procedural protections described in the Tennessee regulations, he would have no constitutional complaint.

The district court ordered that information regarding both Beard's transfer and his reclassification be expunged from his prison records. Beard concedes that

---

4. The Eighth Circuit denied a similar claim because "[a]ppellant has pointed to no statute, regulation or practice which places any substantive limitation on Missouri's discretion to transfer inmates. Nor does appellant show that any particularized standards or criteria were established by the state to govern transfer decisions." *Williams v. Walls,* 744 F.2d 1345, 1346 (8th Cir.1984).

because the district court found no liberty interest was implicated by the transfer regulations, a holding not challenged on appeal, the expungement of his transfer was inappropriate. We therefore vacate that portion of the district court's judgment ordering expungement of Beard's transfer records.

 We agree with the district court, however, that Beard's reclassification from minimum to medium should be expunged from his prison record. Because Beard has a protected liberty interest in his reclassification, and was not afforded the requisite due process before he was reclassified, this reclassification should not remain in Beard's file.

The State cites *Wolf v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), in arguing against expungement as a permissible remedy. The *Wolff* court denied retroactive application of its holding specifying due process requirements for prison disciplinary proceedings. Prison officials were therefore not required to expunge prison records containing determinations of misconduct made without complying with the required procedures. The denial of expungement was based on the "significant impact a retroactivity ruling would have on the administration of all prisons in the country, and the reliance prison officials placed, in good faith, on prior law not requiring such procedures." *Id.* at 574, 94 S.Ct. at 2983. The *Wolff* court goes on to compare the number of misconduct hearings held by the federal government in 1973 with the much lower number of parole revocation hearings, which had earlier been denied retroactive application.

 Nothing in the record indicates the number of reclassifications that occur in the Tennessee system every year, and we decline to speculate on this issue. As for the other basis of *Wolff's* retroactivity holding, however, we believe that there is little basis for a good faith reliance argument in this case. Given the decisions *Hewitt v. Helms, Olim v. Wakinekona,*

and other cases regarding prisoner's liberty interests, and more specifically Tennessee's adoption of its own extensive procedural rules, the prison officials in this case cannot argue reliance on the absence of such procedural requirements.[5]

For these reasons, we believe that *Wolff* is distinguishable from the present case, and the Beard's prison records should be expunged of all references to his reclassification from minimum to medium security. However, all information regarding Beard's administrative transfer should be replaced in his file. The judgment of the district court is therefore affirmed in part and reversed in part.

---

5. This determination whether this rule was "clearly established" for purposes of qualified immunity under *Mitchell v. Forsyth,* —— U.S. ——, 105 S.Ct. 2806, 2817–18 (1985), and *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727 73 L.Ed.2d 396 (1982), is, of course, a separate inquiry.