James M. THOMPSON, et al.,
Plaintiffs–Appellees,

v.

COMMONWEALTH OF KENTUCKY,
DEPT. of CORRECTIONS, et al.,
Defendants–Appellants.

No. 86–5836.

United States Court of Appeals,
Sixth Circuit.

Argued June 15, 1987.
Decided Nov. 19, 1987.
Rehearing and Rehearing En Banc
Denied Jan. 6, 1988.

David A. Sexton, Linda G. Cooper, Barbara W. Jones (argued), Corrections Cabinet, Office of General Counsel, Frankfort, Ky., for defendants-appellants.

Joseph S. Elder, Robert A. Lee (argued), Louisville, Ky., for plaintiffs-appellees.

Before MERRITT, MARTIN and WELLFORD, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

The sole issue presented by this case is whether a consent order and prison policy created a liberty interest in visitation privileges such that due process requires some procedure before denying visitation. The district court found that a liberty interest did exist. We agree.

It is well recognized that there are two means by which a constitutionally protected liberty interest can be found to exist. First, certain rights and interests are so inherent in our society that they may be infringed only if procedural due process has been afforded. Second, the state may build up the public's expectations of a protected interest in other areas by enactment of statutes, regulations and other state actions. In this situation, too, due process requirements must be complied with before that state can limit the individual's interest in the created liberty. Before we apply this approach, however, we summarize the relevant facts.

Plaintiffs, prisoners at the Kentucky State Reformatory and Kentucky State Penitentiary, filed a lawsuit concerning prison interests. The lawsuit led to a consent decree addressing conditions of confinement at the State Reformatory and State Penitentiary. *See Kendrick v. Bland*, 541 F.Supp. 21, 27–49 (W.D.Ky. 1981), *aff'd*, 740 F.2d 432 (6th Cir.1984). Concerning visitation, the consent decree declared: "The Bureau of Corrections encourages and agrees to maintain visitation at least at the current level with minimal restrictions. ... Defendants shall continue their open visitation policy." 541 F.Supp. at 37.

The subsequently-adopted procedures concerning visitation regulations at Kentucky State Reformatory, under which plaintiffs sued defendants in this case, declared:

### STATEMENT OF POLICY AND PURPOSE

Although administrative staff reserves the right to allow or disallow visits, it is the policy of the Kentucky State Reform-

atory to respect the right of inmates to have visits in the spirit of the Court decisions and the Consent Decree, while insuring the safety and security of the institution. The following are the procedures to be enforced in regard to all types of visits.

Kentucky State Reformatory Procedures Memorandum, No. KSR 16–00–01 (Sept. 30, 1985). This policy stated that "[a]n inmate is allowed three (3) separate visits ... per week." *Id.* ¶ B.3. Concerning refusal of visits, the policy stated:

1. A visitor may be denied a visit at any time if one or more of the following exists or there are reasonable grounds to believe that:

a. The visitor's presence in the institution would constitute a clear and probable danger to the safety and security of the institution or would interfere with the orderly operation of the institution, including, but not limited to:

(1) The visitor has a past record of disruptive conduct.

(2) The visitor is under the influence of alcohol or drugs.

(3) The visitor refuses to submit to search or show proper identification upon request.

(4) The visitor is directly related to the inmate's criminal behavior.

(5) The visit will be detrimental to the inmate's rehabilitation.

(6) The visitor is a former resident currently on parole who does not have the approval of his Parole Officer or the Warden.

(7) The visitor is a former resident who has left by maximum expiration of sentence and does not have the prior approval of the Warden.

(8) The visitor has previously violated institutional visiting policies.

*Id.* ¶ K. The 1985 policy also stated that the Duty Officer was responsible for denying visits for the above reasons. If a staff member believed a visitor should be denied, the staff member should notify the Duty Officer, who had the final decision. *Id.* ¶ K 2, 3.

In 1985, inmate Kenneth Bolitt's mother was denied visitation rights for a short time after bringing to the institution a man previously barred from the institution for smuggling contraband. Another inmate's mother and girlfriend also had their visitation privileges suspended when the inmate was convicted of receiving contraband after one of their prior visits. In both instances, the visitation privileges were suspended without a hearing. Plaintiffs filed a motion seeking a court order requiring defendants to establish procedures, including a notice and hearing, to be followed before restricting visitation.

Plaintiffs claim that the due process clause requires such procedures to protect the inmates' liberty interests. The district court agreed with plaintiffs and ordered defendants to establish at least minimal procedures. The necessary predicate to that order was the district court's finding that the inmates had a liberty interest in visitation privileges. The question on appeal is whether the claimed liberty interest exists.

Prison officials have generally been found to possess broad discretionary authority over prison administration. As the Supreme Court has recognized,

"[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities." (Footnote omitted.)

*Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 126, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629 (1977) (quoting *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974)). "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations of our penal system." *Id.* at 125, 97 S.Ct. at 2537. The Supreme Court has "consistently refused to recognize more than the most basic liberty interests in prisoners." *Hewitt v. Helms,* 459

U.S. 460, 467, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983). Thus, the Supreme Court has found no "constitutional or inherent right" to placement in any particular prison or state, *Olim v. Wakinekona*, 461 U.S. 238, 245, 103 S.Ct. 1741, 1745, 75 L.Ed.2d 813 (1983), *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976), placement in any particular section within a prison, *Hewitt v. Helms*, 459 U.S. at 468, 103 S.Ct. at 869, parole, *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979), or good-time credit for satisfactory behavior, *Wolff v. McDonnell*, 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974).

■ Specifically addressing visitation privileges, we have ruled that "[p]rison inmates have no absolute constitutional right to visitation." *Bellamy v. Bradley*, 729 F.2d 416, 420 (6th Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984). This conclusion is in keeping with the above recited Supreme Court decisions. The Court in *Hewitt* asserted that the issues of parole and good-time credits "involve release from institutional life altogether, which is a far more significant change in a prisoner's freedoms than that at issue here [administrative segregation], yet in *Greenholtz* and *Wolff* we held that neither [parole nor good-time credits] involved an interest independently protected by the Due Process Clause." *Hewitt*, 459 U.S. at 468, 103 S.Ct. at 870. That reasoning compels the same conclusion here with respect to visitation privileges. The denial of a visit from a given visitor has a far less significant impact on a prisoner's "freedoms" than parole, good-time credits, or even administrative segregation. Because these rights are not inherently protected by the due process clause, visitation privileges are not inherent constitutional rights.

Despite the absence of a claim of inherent constitutional right, a state may nevertheless create a liberty interest by enacting a statute or regulation, *Hewitt*, 459 U.S. at 469, 103 S.Ct. at 870, and we have further held that liberty interests can be created by prison officials' policy statements and other promulgations. *Bills v. Henderson*, 631 F.2d 1287, 1291 (6th Cir.1980) (citing *Walk-*

*er v. Hughes*, 558 F.2d 1247, 1255 (6th Cir.1977). Courts have found, for example, that state statutes or prison policies have created liberty interests in not being placed in administrative or disciplinary segregation, *Hewitt*, 459 U.S. at 472, 103 S.Ct. at 871, *Franklin v. Aycock*, 795 F.2d 1253, 1260 (6th Cir.1986), *Bills v. Henderson*, 631 F.2d at 1294, not being transferred from a prison to a mental hospital, *Vitek v. Jones*, 445 U.S. 480, 489, 100 S.Ct. 1254, 1261, 63 L.Ed.2d 552 (1980), not being reclassified from minimum to medium security, *Beard v. Livesay*, 798 F.2d 874, 879 (6th Cir.1986), eligibility for parole, *Greenholtz*, 442 U.S. at 12, 99 S.Ct. at 2106, *Mayes v. Trammel*, 751 F.2d 175, 179 (6th Cir.1984), not being placed in solitary confinement, *Wright v. Enomoto*, 462 F.Supp. 397, 403 (N.D.Cal. 1976), *aff'd mem.*, 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978), and receiving good-time credit for satisfactory behavior, *Wolff*, 418 U.S. at 556–57, 94 S.Ct. at 2975.

As the Supreme Court asserted in *Hewitt*,

> There are persuasive reasons why we should be loath to transpose all of the reasoning in the cases just cited to the situation where the statute and the regulations govern the day-to-day administration of a prison system. The deprivations imposed in the course of the daily operations of an institution are likely to be minor when compared to the release from custody at issue in parole decisions and good-time credits. Moreover, the safe and efficient operation of a prison on a day-to-day basis has traditionally been entrusted to the expertise of prison officials, see *Meachum v. Fano*, [427 U.S.] at 225 [96 S.Ct. at 2538]. These facts suggest that regulations structuring the authority of prison administrators may warrant treatment, for purposes of creation of entitlements to "liberty," different from statutes and regulations in other areas.

459 U.S. at 470, 103 S.Ct. at 870. Despite these "persuasive reasons," however, the *Hewitt* court found that the Pennsylvania statutes and regulations had created a pro-

tected liberty interest. *Id.* at 470–71, 103 S.Ct. at 870–71.

We, too, find persuasive reasons to distinguish visitation privileges from parole good-time credits, or even administrative or disciplinary segregation. We recognize, however, that a state may create a liberty interest in freedom from even relatively minor deprivations, *see Hewitt,* 459 U.S. at 470–71, 103 S.Ct. at 870–71. We conclude, therefore, that a state may also create a liberty interest in visitation. We must next consider whether the prison policies at issue in this case created a liberty interest in visitation privileges.

■ Whether a protected liberty interest has been created depends on whether the inmates have a "legitimate claim of entitlement" to the interest rather than a mere "unilateral expectation." *See Beard v. Livesay,* 798 F.2d 874, 877 (6th Cir.1986). An entitlement and protected interest exist if "statutes or prison policy statements have limited prison officials' discretion by imposing a specific prerequisite to the forfeiture of benefits...." *Id.* (quoting *Bills v. Henderson,* 631 F.2d at 1292–93). If prison officials have "complete discretion," however, no liberty interest has been created. *Beard,* 798 F.2d at 877 (quoting *Bills* ). The Supreme Court used similar language in *Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983):

> These cases demonstrate that a State creates a protected liberty interest by placing substantive limitations on official discretion. An inmate must show "that particularized standards or criteria guide the State's decisionmakers." *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 467 [101 S.Ct. 2460, 2465, 69 L.Ed.2d 158] (1981) (Brennan, J., concurring). If the decisionmaker is not "required to base its decisions on objective and defined criteria," but instead "can deny the requested relief for any constitutionally permissible reason or for no reason at all," *ibid,* the State has not created a constitutionally protected liberty interest. See *id.,* at 466–67 [101 S.Ct. at 2465] (opinion of the Court); see also

*Vitek v. Jones,* 445 U.S., at 488–491 [100 S.Ct. at 1261–1262] (summarizing cases). *Id.* at 249, 103 S.Ct. at 1747. *Compare Olim,* 461 U.S. at 249, 103 S.Ct. at 1747 (no liberty interest because no standards limited or restricted the officials' determination), *and Meachum v. Fano,* 427 U.S. at 228, 96 S.Ct. at 2540 (no liberty interest because officials had discretion to transfer prisoner for any reason or for no reason) *with Wolff v. McDonnell,* 418 U.S. at 558, 94 S.Ct. at 2976 (liberty interest created because state created statutory right to good-time credit which could be withdrawn only for "serious misconduct"). The *Hewitt* Court also made clear that procedural guidelines alone do not establish a liberty interest, but "the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates" creates a liberty interest. 459 U.S. at 471–72, 103 S.Ct. at 871.

■ We turn now to the determination of whether the state went beyond the establishment of mere guidelines by using "mandatory language" in connection with "specific substantive predicates," *Hewitt,* 459 U.S. at 472, 103 S.Ct. at 871. That is, whether the state, in the words of *Olim,* placed "substantive limitations on official discretion" with "particularized standards." *Olim,* 461 U.S. at 249, 103 S.Ct. at 1747. For the reasons set out below, we believe the state did do more than just establish guidelines.

"Mandatory" language can be found in the consent order and policy statements at issue here. In the consent order, it is written that "Defendants *shall* continue their open visitation policy." 541 F.Supp. at 37. The policy statement provides further that "An inmate *is* allowed three separate visits per week." (emphasis added). We recognize, however, that while this mandatory language buttresses the argument for finding a protected liberty interest, it may not be sufficient, by itself, to create a protected liberty interest.

In this case, however, each of the three sets of prison policies in effect since the signing of the consent decree placed "substantive limitations on official discretion,"

*Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983), by enumerating "particularized standards or criteria" to constrain the discretion of state decisionmakers. *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 467, 101 S.Ct. 2460, 2465, 69 L.Ed.2d 158 (1981) (Brennan, J., concurring). According to the sets of regulations in effect at the time of the signing of the consent decree, and currently, visitors may be excluded only when "there are reasonable grounds to believe" that a visitor's presence would constitute a "clear and probable danger" to the institution's safety, security, or orderly operation. A nonexhaustive series of examples then follows, cited *supra* in this opinion. Both the "reasonable grounds to believe [a visitor constitutes] a clear and probable danger" and the examples listed that satisfy this criterion are *substantive* determinations that form the basis for official decisions to exclude visitors. *Hewitt,* 459 U.S. at 471–72, 103 S.Ct. at 871.

A set of policies also apparently in effect since 1981 states that "certain visitors who are either a threat to the security or order of the institution or nonconducive to the successful re-entry of the inmate to the community may be excluded." A similar nonexhaustive series of six examples follows. Corrections Policies and Procedures No. 403.06. Thus, the consent order and policy statements indicate that prison officials are constrained by substantive limitations and do not enjoy absolute discretion when excluding visitors.

It is well settled that the presence of regulatory language that meaningfully limits the discretion of decisionmakers can create a liberty interest. Such an interest may be created even if the restrictions imposed are largely predictive and are based upon the application of standards of reasonableness. *See Board of Pardons v. Allen,* —— U.S. ——, 107 S.Ct. 2415, 2418–21 & n. 10, 96 L.Ed.2d 303 (1987); *Mayes v. Trammell,* 751 F.2d 175, 178–79 (6th Cir. 1984). We conclude that, given the regulatory and mandatory language discussed above, a liberty interest was created under the circumstances here.

█ We must remand this case, however, for a further determination of precisely which set of regulations covers the plaintiff class. The Procedures Memorandum, which we find does create a liberty interest, purports to cover visits at the Kentucky State Reformatory; it is unclear from the record what set of regulations governs visits in other parts of the Kentucky system. We affirm the District Court's holding that the current lack of any kind of hearing does not violate the consent decree. We do not reach, therefore, the issue of whether a consent decree can create a liberty interest enforceable beyond a district court's traditional power to enforce its orders. *Cf. Green v. McKaskle,* 788 F.2d 1116, 1123–24 (5th Cir.1986).

The decision of the District Court is affirmed in part, as aforesaid, and the case remanded for findings concerning the precise set of prison regulations applicable to plaintiffs and the precise nature of the limitations on official discretion contained in the applicable regulation and for further proceedings respecting the particular procedural process due the plaintiffs when visitation is denied.

WELLFORD, Circuit Judge, concurring:

I concur in the remand with some reluctance because of my reservation about creation of a liberty interest under the Procedures Memorandum. I concur that lack of a hearing in the Kentucky procedures does not violate the consent decree, and would conclude that the consent decree creates no liberty interest "enforceable beyond a district court's traditional power to enforce its orders."

My reluctance about creation of a liberty interest involves the following considerations. Visitation is merely a part of the daily operation of the prison, which affects only the circumstances of the prisoner's situation in prison. By contrast, parole and good-time credit decisions affect a prisoner's *release* from custody, which fully implicates his "liberty" in the ordinary meaning of the word. Moreover, "[t]he concept

of incarceration itself entails a restriction on the freedom of inmates to associate with those outside of the penal institution." *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 126, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629 (1977). Decisions concerning visitation privileges, therefore, involve, in my view, even less of an encroachment on a prisoner's remaining "freedoms" while in prison than do decisions concerning his associational rights or placement within the prison. Administrative or disciplinary segregation directly affects the prisoner's "liberty" in that it further restricts his freedom to be in certain areas or associate with certain inmates. The decision to exclude an outside visitor does not affect in the same sense or degree the "freedoms" of association or placement within the prison. Furthermore, excluding a certain visitor but allowing others to visit the prisoner represents a relatively minor "deprivation." I recognize also that a state may create a liberty interest in freedom from even relatively minor deprivations. *See Hewitt v. Helms*, 459 U.S. 460, 470–71, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983).

Applying these *Hewitt* criteria to the facts of this case presents a very close question for resolution. Prison officials had established guidelines for denying visits, but mere guidelines to "channel the decisionmaking of prison officials" do not create a liberty interest. *Hewitt*, 459 U.S. at 471, 103 S.Ct. at 871. The question is whether the state went beyond mere guidelines by using "mandatory language" in connection with "specific substantive predicates," *id.* at 472, 103 S.Ct. at 871, or, in the words of *Olim v. Wakinekona*, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983), placed "substantive limitations on official discretion" with "particularized standards." *Id.* at 249, 103 S.Ct. at 1747.

The only "mandatory" language in the consent order or policy statements at issue appears once in the consent order—"Defendants *shall* continue their open visiting policy," 541 F.Supp. at 37—and once in the policy statement—"An inmate *is* allowed three separate visits per week." (Emphasis added). This is considerably less than the "repeated use" of mandatory language

in the statute at issue in *Hewitt. See* 459 U.S. at 470 n. 6, 103 S.Ct. at 871 n. 6 ("The inmate *shall* be notified ... [a]n investigation *shall* begin immediately ... the inmate *must* be released [if] ... the institutional representative *shall* ... [s]uch hearing *shall* be held within four (4) days....") (emphasis added).

The degree of discretion left to the Kentucky prison officials in determining which visitors may be denied is not entirely clear. The policy provides that a visitor "may be denied a visit ... if one or more of the following exists or there are reasonable grounds to believe that" one of the listed reasons exists. The policy also leaves the final decision and considerable discretion to deny a visit, "for the above reasons," to the Duty Officer.

This policy does not fall neatly into either of the categories outlined by *Bills v. Henderson*, 631 F.2d 1287 (6th Cir.1980). The guidelines arguably leave the Duty Officer with broad discretion and do no more than "channel [his] decisionmaking" along the stated guidelines. *See Hewitt*, 459 U.S. at 471, 103 S.Ct. at 871. This policy does not, however, leave the Duty Officer with "complete discretion" to deny a visit for any reason or for no reason at all. *Cf. Olim*, 461 U.S. at 249, 103 S.Ct. at 1747; *Bills*, 631 F.2d at 1293.

I doubt that the policy here involved establishes "particularized standards" or "objective and defined criteria" that place sufficient limitation on the officials' discretion to create a liberty interest. The policy at issue is not as detailed as some of the statutes and policies found to create liberty interests. *See, e.g., Beard v. Livesay*, 798 F.2d 874, 878 (6th Cir.1986) (describing "very detailed procedures, together with the substantive limitation ..."); *Franklin v. Aycock*, 795 F.2d 1253, 1260 and 1260 n. 5 (6th Cir.1986) (rather detailed procedures). In this case, a visit can be denied only for listed reasons. In contrast, the procedures in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), for reporting and determining whether a prisoner committed "serious misconduct" were rather elaborate, *see id.* at 548–53 and

n. 8, 94 S.Ct. at 2970–73 and n. 8, and the Court decided that procedures were necessary because of the importance of the determination of serious misconduct.

I am mindful that other decisions not heretofore discussed in detail have found liberty interests to exist after consideration of the language involved in the statute or regulation. *See Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Bills v. Henderson,* 631 F.2d 1287 (6th Cir.1980); *Mayes v. Trammell,* 751 F.2d 175, 178–79 (6th Cir. 1984).