892 F.2d 80
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
H. Vaughn TOWNSEND, M.D., et al. Plaintiffs-Appellees,
v.
Henry G. CRAMBLETT, M.D., Peter Lancione, M.D., Leonard L.
Lovshin, M.D., Lucy O. Oxley, M.D., Joseph P. Yut, M.D.,
John H. Buchan, D.P.M., William H. Johnston, Deirdre
O'Connor, M.D., Carol Rolfes, R.N., and John E. Rauch, D.O.,
Defendants-Appellants,
and
Ohio State Medical Board, Defendant.
 No. 89-3353.
 United States Court of Appeals, Sixth Circuit.
 Dec. 21, 1989.
 
 Before MILBURN and RALPH B. GUY, Jr., Circuit Judges, and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 The named plaintiffs, as well as the members of the class they represent, obtained undergraduate diplomas from colleges and universities in the United States and then completed graduate studies in medicine at various foreign medical schools that have come into existence since 1970.[1] After receiving their diplomas, these graduates sought either temporary or permanent licenses to practice medicine in the State of Ohio. Notwithstanding their completion of the medical school curriculum, the plaintiffs uniformly were denied professional licenses by the Ohio State Medical Board (Board). This litigation followed.
 
 
 2
 The Board's failure to grant licenses to the plaintiffs apparently resulted from the Board's refusal to recognize the credentials of students who attended foreign medical schools not listed in the World Health Organization's 1970 Directory of Medical Schools. According to Board policy as of 1984, a foreign medical school not included in the 1970 directory had to be satisfactorily evaluated by the Board before the school's graduates were permitted to obtain Ohio licenses.[2] The plaintiffs contend that the Board's exclusive reliance on the 1970 directory to the detriment of new foreign medical schools and their graduates constituted an impermissible and improperly adopted rule under Ohio law. Moreover, the plaintiffs assert that the Board's application of its unlawful policy has deprived the graduates of new foreign medical schools of their liberty interest in practicing medicine in Ohio without due process.
 
 
 3
 The ten individual members of the Board named as defendants in this suit filed a motion for summary judgment interposing, among a broad range of arguments, the defense of qualified immunity.[3] Specifically, the individual defendants contended that the plaintiffs' liberty interest in practicing medicine was not clearly established when the plaintiffs filed suit in 1984. (App. at 181). In addition, the defendants asserted that their approach to analyzing the graduates of foreign medical schools was not clearly impermissible under any state or federal law as of 1984. (App. at 181).
 
 
 4
 The district court, however, concluded that the board members knew or should have known that the Board's policy violated both Ohio's procedural law governing promulgation of rules and the state's substantive law prescribing the conditions and methods for licensing foreign medical school graduates. The court reasoned that the board members knew in 1979 that improper adoption of rules would be ineffectual, and that Board review of individual foreign medical schools was not authorized by Ohio law. Accordingly, the court denied the board members' motion for summary judgment insofar as the plaintiffs' liberty interest in practicing medicine is concerned.[4] The defendants promptly appealed the denial of qualified immunity.[5] Because we find that the district court improperly rejected the individual defendants' qualified immunity argument, we reverse.
 
 I.
 
 5
 The doctrine of qualified or good faith immunity insulates public officials "performing discretionary functions" from individual liability "for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). According to the Supreme Court, "[t]he contours of the right" alleged to have been violated "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Moreover, as we have explained, "[t]he relevant inquiry focuses on whether a reasonable official in the defendant's position could have believed his conduct to be lawful, considering the state of the law as it existed when the defendant took his challenged actions." Poe v. Haydon, 853 F.2d 418, 423-24 (6th Cir.1988) (emphasis added), cert. denied, 109 S.Ct. 788 (1989). Thus, the individual board members in this case are entitled to qualified immunity unless the plaintiffs' "rights were so clearly established when the acts were committed that any [board member] in the defendant[s'] position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct." Dominque v. Telb, 831 F.2d 673, 676 (6th Cir.1987).
 
 
 6
 "The question of whether qualified immunity attaches to an official's actions is a purely legal question[,]" Garvie v. Jackson, 845 F.2d 647, 649 (6th Cir.1988), so we review the district court's denial of qualified immunity de novo. See, e.g., Tribble v. Gardner, 860 F.2d 321, 323 (9th Cir.1988), cert. denied, 109 S.Ct. 2087 (1989). Our task is to ascertain whether the individual board members engaged in any conduct violative of the plaintiffs' rights as established prior to May 1, 1984. Because the district court derived the plaintiffs' fourteenth amendment liberty interest in the practice of medicine in Ohio purely from the state's statutory licensing scheme,[6] (App. at 290-92), we must analyze the settled law of Ohio as of 1984.
 
 II.
 
 7
 Under Ohio law, the Board is vested with "the power of examining applicants to determine their fitness to practice medicine." Hyde v. State Medical Bd., 33 Ohio App.3d 309, 311, 515 N.E.2d 1015, 1017 (1986). This broad power is circumscribed by a statutory framework designed to guide the Board in the exercise of its discretion. For example, a United States citizen who holds an undergraduate degree from an approved school and "who has studied medicine at a medical school located outside the United States which is listed by the world health organization ... shall be admitted to the [permanent licensure] examination" upon completion of several enumerated requirements. OHIO REV.CODE ANN. § 4731.09(B) (Anderson 1987) (emphasis added). Likewise, temporary licensure is available to any qualifying graduate of "a medical or osteopathic school or college which, in the judgment of the [B]oard, is reputable or in good standing[.]" Id. § 4731.291.
 
 
 8
 Pursuant to what is viewed as its statutory directive in the early 1980s, the Board applied a stringent licensing policy to candidates who received their degrees from foreign medical schools. Specifically, the Board only recognized credentials from foreign schools listed in the 1970 World Health Organization directory; the Board declined to recognize listings in subsequent World Health Organization directories because the standards for inclusion in more recent directories were significantly relaxed. See Hyde, 33 Ohio App.3d at 311, 515 N.E.2d at 1017-18. Although the Board did provide for certification upon individualized consideration of schools not listed in the 1970 directory, the Board's policy unquestionably foreclosed graduates of foreign schools listed solely in more recent directories from automatic credential recognition.
 
 
 9
 In 1986, more than two years after the plaintiffs filed this suit, the Ohio Court of Appeals determined that the Board lacked the rulemaking authority to adopt its policy concerning graduates of foreign medical schools,[7] see Hyde, 33 Ohio App.3d at 313, 515 N.E.2d at 1019, and held that the Board's policy "changed the meaning of the [permanent licensing] statute[.]" See id. In dissent, Judge McCormac opined that "[w]hat it means to be listed by the World Health Organization is ambiguous, particularly in light of the history of listing by that organization." Id. at 315, 515 N.E.2d at 1020 (McCormac, J., dissenting). Thus, Judge McCormac reasoned that the Board was well within its authority "to give substance to the requirement of 'listing[.]' " Id. at 315, 515 N.E.2d at 1020-21. When the Ohio Court of Appeals extended the logic of Hyde to temporary licensing decisions in 1988, the Ohio Supreme Court decided to review the appellate court's ruling. See Anderson v. State Medical Bd., No. 87AP-625 (Ohio App. July 28, 1988) (unpublished), leave granted, 40 Ohio St.3d 706, 534 N.E.2d 847 (1988).
 
 
 10
 After canvassing the development of Ohio law, the district court determined that Ohio's statutory licensing scheme pertaining to graduates of foreign medical schools, as construed by Hyde, clearly established "as early as 1979" that the Board lacked the authority to either promulgate rules or limit the concept of listing to the 1970 directory. Based on its procedural and substantive concerns about the Board's policy regarding the listing of foreign medical schools, the district court found the defense of qualified immunity inapplicable.
 
 III.
 
 11
 The district court's concern with the Board's procedural authority to promulgate its policy as a formal rule is, in our view, misplaced. While the Board may not have had the authority under Ohio law to promulgate its policy on listing of foreign medical schools as a formal rule, see Hyde, 33 Ohio App.3d at 313, 515 N.E.2d at 1019, the Board historically has possessed extensive power to examine medical schools, see State ex rel. Hygea Medical College v. Coleman, 64 Ohio St. 377, 388, 60 N.E. 568, 572 (1901), and to evaluate their graduates' "fitness to practice medicine." Hyde, 33 Ohio App.3d at 311, 515 N.E.2d at 1017. For this reason, the Board most assuredly could have devised informal standards for considering medical schools and license applicants without formally promulgating such policies as rules. The Board thus would have run afoul of state law only by implementing substantively (as opposed to procedurally) flawed policies. Consequently, procedural defects in Board rules, though perhaps violative of state law, do not perforce give rise to a constitutionally protected liberty interest in this context.[8] Cf. Harris v. Birmingham Bd. of Educ., 817 F.2d 1525, 1528 (11th Cir.1987) ("[T]he violation of a state statute outlining procedure does not necessarily equate to a due process violation under the federal constitution.").
 
 
 12
 According to the Supreme Court, "a State creates a protected liberty interest by placing substantive limitations on official discretion." Olim v. Wakinekona, 461 U.S. 238, 249 (1983) (emphasis added); accord Beard v. Livesay, 798 F.2d 874, 876 (6th Cir.1986). Conversely, a state statute that merely prescribes procedure, yet "place[s] no substantive limitations on official discretion ... create[s] no liberty interest entitled to protection under the Due Process Clause." Olim, 461 U.S. at 249. The Ohio statutory scheme governing rulemaking, which the Board apparently disregarded in devising its interpretive policy concerning the statutory listing requirement, see Hyde, 33 Ohio App.3d at 313, 515 N.E.2d at 1019, places no substantive limitations on the Board's power to assess the credentials of license applicants and ultimately grant or deny licenses based on its assessment. See OHIO REV.CODE ANN. § 119.01, et seq. As such, the Ohio statutory rulemaking scheme cannot form the basis of the plaintiffs' alleged liberty interest in licensure to practice medicine. See Olim at 250-51. If the plaintiffs have any claim for deprivation of a cognizable liberty interest, that claim must arise from a substantive defect in the policy applied by the defendant board members.
 
 
 13
 The focal point of our qualified immunity inquiry must be the substantive, statutory licensing criteria as interpreted by the Ohio courts, which form the basis of the plaintiffs' purported liberty interest. The pertinent provision in this respect mandates admission to all graduates of any "medical school located outside the United States which is listed by the world health organization[.]" See OHIO REV.CODE ANN. § 4731.09(B). Ohio's statutory licensing scheme, however, fails to define precisely what the listing requirement contemplates. The board members collectively chose to define the term by reference to the 1970 directory, which was the World Health Organization's latest pronouncement when the Ohio legislature adopted the listing standard. The Board's interpretation remained the operative standard until 1986 when a divided Ohio Court of Appeals panel eschewed the Board's construction of the listing provision. See Hyde, 33 Ohio App.3d 309, 515 N.E.2d 1015 (1986). Nevertheless, the plaintiffs characterize the statutory listing requirement as clearly established prior to 1984.
 
 
 14
 In Robinson v. Bibb, 840 F.2d 349 (6th Cir.1988), we explained that "a question must be decided either by the highest state court in the state where the case arose, by a United States Court of Appeals, or by the Supreme Court" in order to be "clearly established" for purposes of qualified immunity. Id. at 351. The impropriety of limiting automatically qualifying foreign medical schools to those listed in the 1970 World Health Organization directory has never been established by the Ohio Supreme Court. Only the Ohio Court of Appeals has reached such a conclusion, see Hyde, 33 Ohio App.3d 309, 515 N.E.2d 1015; Anderson, No. 87AP-625, and its ruling in Anderson currently is before the Ohio Supreme Court. In short, we cannot find authority to support the district court's conclusion that the "impropriety" of the Board's policy regarding foreign medical schools has ever been clearly established. This determination is bolstered by the Hyde dissent, which aptly notes that the meaning of a listing by the World Health Organization is, itself, unclear. See Hyde, 33 Ohio App.3d at 315, 515 N.E.2d at 1020 (McCormac, J., dissenting). Simply put, the individual board members could not have known prior to the 1986 Hyde decision that their interpretation of the phrase "listed by the world health organization" was improper. Indeed, both the Franklin County Court of Common Pleas that initially decided Hyde and Judge McCormac writing in dissent on appeal endorsed the Board's interpretation of the statutory language. Because no Ohio court provided a contrary reading of the pertinent statutory language until 1986, more than two years after the plaintiffs filed this suit, and because the Ohio Supreme Court still has not rejected the Board's interpretation, the defendants are entitled to qualified immunity from monetary damages in this case.[9]
 
 
 15
 REVERSED.
 
 
 
 [1]
 Two foreign medical schools, St. George's University School of Medicine and Ross University, have intervened as plaintiffs
 
 
 [2]
 This policy, previously set forth in OHIO ADMIN.CODE § 4731-3-16, was temporarily repealed effective June 6, 1988, and then permanently repealed effective February 10, 1989
 
 
 [3]
 The plaintiffs critically note the defendants' failure to plead qualified immunity as an affirmative defense. Failure to promptly plead qualified immunity is not necessarily a bar to assertion of the defense. See Kennedy v. City of Cleveland, 797 F.2d 297, 300 (6th Cir.1986), cert. denied, 479 U.S. 1103 (1987). Indeed, the Seventh Circuit recently commented that qualified immunity may be raised as a defense by pleading or motion "at any stage in the litigation." Alvarado v. Picur, 859 F.2d 448, 451 n. 3 (7th Cir.1988) (collecting cases). The defendants in this case presented the qualified immunity issue twice by motion well before trial was even contemplated. Under the circumstances, the district court did not act improperly in addressing the merits of the qualified immunity argument
 
 
 [4]
 The district court's opinion addressed myriad issues in addition to the qualified immunity question. In their briefs on appeal, the parties have attacked various aspects of the district court's ruling that have little or nothing to do with qualified immunity. We cannot undertake appellate review of such matters at this juncture, see, e.g., Estrada-Adorno v. Gonzalez, 861 F.2d 304, 307 (1st Cir.1988), so we need not even enumerate, much less resolve, such premature issues
 
 
 [5]
 Immediate appeal of the qualified immunity issue is authorized by Mitchell v. Forsyth, 472 U.S. 511, 524-30 (1985). No other aspect of the case is presently before us
 
 
 [6]
 A liberty interest may be based on either the Constitution or a state law or regulation. See, e.g., Beard v. Livesay, 798 F.2d 874, 876 (6th Cir.1986). The Fifth Circuit's decision in Neuwirth v. Louisiana State Bd. of Dentistry, 845 F.2d 553 (5th Cir.1988), implicitly acknowledges that, under certain circumstances, an individual can obtain a liberty interest in the practice of a profession based upon state law. See id. at 557-58. The plaintiffs' due process claim in this case ostensibly is limited to such a theory
 
 
 [7]
 The Board did obtain the requisite rulemaking power on August 27, 1982, see 139 Ohio Laws 2401, 2407 (1981-1982) (Amended Substitute House Bill No. 317 codified at OHIO REV.CODE ANN. § 4731.05), but the Board's policy of recognizing only foreign medical schools listed in the 1970 directory predated the acquisition of rulemaking authority
 
 
 [8]
 The success of several individual plaintiffs in state court evinces the willingness of the Ohio courts to cure any harm that has resulted from the Board's procedural misstep. See, e.g., Hickey v. State Medical Bd., No. 88AP-769 (Apr. 27, 1989) (unpublished); Anderson, No. 87AP-625; Hyde, 33 Ohio App.3d 309, 515 N.E.2d 1015
 
 
 [9]
 Based on our disposition of the individual defendants' qualified immunity argument, we need not reach the question of whether the board members are entitled to absolute immunity under Horwitz v. State Bd. of Medical Examiners of Colorado, 822 F.2d 1508 (10th Cir.), cert. denied, 484 U.S. 964 (1987). We note, however, that the defendants' effort to raise this issue on appeal appears inappropriate. The district court rejected the absolute immunity argument in an August 19, 1987, memorandum and order, yet the individual defendants did not file their notice of appeal until April 17, 1989. Moreover, the notice of appeal expressly states that the individual defendants "hereby appeal ... from the order entered March 17, 1989, denying their claim of qualified immunity." (App. at 299)