Elizabeth B. MAYO, Plaintiff–Appellant,

v.

Michael P. LANE, et al., Defendants–Appellees.

No. 85–3217.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 13, 1988.

Decided Jan. 25, 1989.

Barbara S. Shulman, Univ. of Chicago Legal Clinic, Chicago, Ill., for plaintiff-appellant.

Bret A. Rappaport, Atty. Gen., Civ. Div., Chicago, Ill., for defendants-appellees.

Before POSNER, FLAUM, and MANION, Circuit Judges.

POSNER, Circuit Judge.

Elizabeth Mayo appeals from the dismissal of her suit challenging an order by an official of the Illinois prison system that bars her from visiting any Illinois state

prison. The suit, brought under 42 U.S.C. § 1983, alleges that the order deprived her of liberty and property without due process of law, in violation of the Fourteenth Amendment. She sought damages and an injunction. The ground of dismissal was failure to state a claim, Fed.R.Civ.P. 12(b)(6); specifically, the district judge believed that the complaint failed to allege a deprivation of "liberty" or "property" as these terms are understood in cases interpreting the Fourteenth Amendment.

On July 19, 1984, Mrs. Mayo had visited her grandnephew, Larry McCall–Bey, who was serving time for armed robbery at the Dixon Correctional Facility. She had been accompanied by three minors, including Lorraine Davidson. Prison staff observed Davidson chatting with another inmate (not McCall–Bey) and then entering the women's bathroom without signing in at the visitors' desk, as required. Immediately afterward, the staff searched the bathroom and found a large quantity of marijuana. They concluded that Davidson had placed it there. On July 29, the prison's warden wrote Mrs. Mayo a letter reciting these facts and informing her that, "In light of the above, you are permanently restricted from visiting this facility and every other Adult Institution in the State of Illinois." On December 21, 1984, McCall–Bey was paroled. This suit was filed on January 14, 1985.

■ We see many cases where people invoke the Constitution to get out of prison; this is the first case we have seen where a person is invoking the Constitution to get into one. Mrs. Mayo sensibly does not argue that a person's natural liberty (on which see *McKinney v. George*, 726 F.2d 1183, 1189 (7th Cir.1984)) is infringed when he or she is forbidden to enter a prison. It is imprisonment that robs a person of natural liberty—not exclusion from prison. (The distinction is basic to the tort of false imprisonment. Locking a person in his room is false imprisonment; locking him out of his room is not. See *Martin v. Lincoln Park West Corp.*, 219 F.2d 622 (7th Cir.1955), and other cases cited in Prosser and Keeton on the Law of Torts

§ 11, at p. 47 n. 6 (5th ed. 1984).) Mrs. Mayo makes four arguments for why she is nonetheless being deprived of liberty or property by being forbidden to visit Illinois state prisons. The first is that she is an ordained minister, and an Illinois statute provides that "Clergy, religious chaplain and attorney visiting privileges shall be as broad as the security of the institution or facility will allow." Ill.Rev.Stat. ch. 38, ¶ 1003–7–2(f). The district judge refused to consider the possible bearing of this provision because the complaint had failed to cite it or to allege that Mrs. Mayo is a minister, ordained or otherwise. For reasons we shall explain, she has no standing to complain that the state deprived her of an entitlement (if any) created by the quoted language.

■ Mrs. Mayo argues that her natural liberty includes a right of association with members of her family, such as grandnephew McCall–Bey, and that this right in turn comprehends the right to visit him in prison. This is not a frivolous argument. The concept of liberty in the Fourteenth Amendment has been held to embrace a right to associate with one's relatives. See, e.g., *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion); *Bergren v. City of Milwaukee*, 811 F.2d 1139, 1144 (7th Cir.1987); *Shondel v. McDermott*, 775 F.2d 859, 860–61 (7th Cir.1985); *Ellis v. Hamilton*, 669 F.2d 510 (7th Cir.1982); *Trujillo v. Board of County Commissioners*, 768 F.2d 1186, 1188–89 (10th Cir.1985). (One court has even held—we are astonished to report—that dating is a Fourteenth Amendment liberty. See *Wilson v. Taylor*, 733 F.2d 1539 (11th Cir.1984); see generally *IDK, Inc. v. County of Clark*, 836 F.2d 1185, 1191–93 (9th Cir.1988).) But it is a slight argument, for reasons well discussed in a case factually similar to the present one, *White v. Keller*, 438 F.Supp. 110, 120 (D.Md.1977), aff'd per curiam, 588 F.2d 913 (4th Cir.1978). Prison necessarily disrupts the normal pattern of familial association, so lawful imprisonment can hardly be thought a deprivation of the *right* of relatives to associate with the imprisoned criminal. Cf. *O'Bannon v. Town Court Nurs-*

*ing Center*, 447 U.S. 773, 788, 100 S.Ct. 2467, 2476–77, 65 L.Ed.2d 506 (1980) ("members of a family who have been dependent on an errant father ... may suffer serious trauma if he is deprived of his liberty or property as a consequence of criminal proceedings, but surely they have no constitutional right to participate in his trial or sentencing procedures"). More fundamentally, the person with the primary stake in the deprivations caused by imprisonment is the prisoner himself, and he rather than his relatives is the proper party to complain about those deprivations. More fundamentally still, *Mrs. Mayo* has no standing to assert a constitutional right to visit her grandnephew in prison, because there is no allegation in the complaint, or anywhere else in the record, that she has been prevented from visiting McCall–Bey or any other relative imprisoned by the State of Illinois. There was no interference with her visit on July 19, 1984. There is no suggestion, by way of affidavit or otherwise, that she *wanted* to visit McCall–Bey after that, before his release from prison on parole in December; or that any of her other relatives are in prison or about to be put there.

In short there is no indication either that Mrs. Mayo has been injured by the order barring her from visiting Illinois prisons (and so might obtain damages) or that she would derive a benefit from rescission of the order (and so might be aided by the injunction she seeks). She is like a person who is in a room locked from the outside but does not know the room is locked and does not attempt to leave during the time it is locked. More precisely, she is like a person standing outside a locked room, neither knowing the room is locked nor desiring to enter it. Such a person incurs no harm from the fact that the door is locked.

■ Mrs. Mayo's next argument is also based on paragraph 1003–7–2(f) of chapter 38 of the Illinois Revised Statutes, and in particular on the statement in that paragraph that "All of the institutions and facilities of the Department shall permit every committed person to receive visitors." If this provision creates any rights (as sug-gested in *United States ex rel. Adams v. O'Leary*, 659 F.Supp. 736 (N.D.Ill.1987), but the question must be regarded as an open one since a district judge's opinion is not an authoritative precedent, *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1124 (7th Cir.1987); cf. *Lingle v. Norge Division of Magic Chef, Inc.*, 823 F.2d 1031, 1044 n. 14 (7th Cir.1987) (en banc), rev'd on other grounds, ___ U.S. ___, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988)), they are rights of prisoners. The quoted language creates, at most, a right to *receive* visitors, not a right to visit. Mrs. Mayo has no standing to assert such a right, unless perchance as the representative of a prisoner who wants her to visit and is somehow unable to assert his rights directly, such hindrance to first-party litigation being the normal prerequisite to allowing a third party to assert one's rights. See *Singleton v. Wulff*, 428 U.S. 106, 116, 96 S.Ct. 2868, 2875, 49 L.Ed.2d 826 (1976). But nowhere is it alleged that any prisoner desires a visit from Mrs. Mayo, let alone that such prisoner is unable to enforce without her aid whatever right he might have to receive a visit from her. The absence of an allegation that any prisoner desires a visit from Mrs. Mayo excuses us from having to consider possible exceptions to the hindrance requirement for third-party litigation. See *Gometz v. Henman*, 807 F.2d 113, 115 (7th Cir.1986).

Last, Mrs. Mayo invokes Administrative Directive 05.01.106 issued by the Illinois prison system. This directive is in two sections, "Policy" and "Procedure." The "Policy" section states, so far as bears on this case, that "In order to preserve the security of the facility, visitor access shall be carefully controlled. 1. Visitors who demonstrate inappropriate behavior will be temporarily or permanently restricted from institutional visits." The reference to "inappropriate behavior" is too vague to confer an entitlement on visitors. It does not purport to constrain the exercise of discretion by the prison authorities, and thus does not create the sort of entitlement that resembles, and counts as, property. Cf. *Reed v. Village of Shorewood*, 704 F.2d 943, 948 (7th Cir.1983). The "Procedure" section of the directive sets forth proce-

dures for determining whether a visitor has behaved inappropriately and, if so, whether the visitor should be barred temporarily or permanently. Procedures alone do not create a substantive entitlement on which a suit under the due process clause may be based. See, e.g., *Hewitt v. Helms*, 459 U.S. 460, 471, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983); *Archie v. City of Racine*, 847 F.2d 1211, 1217 (7th Cir.1988) (en banc); *Mathews v. Fairman*, 779 F.2d 409 (7th Cir. 1985); *Shango v. Jurich*, 681 F.2d 1091, 1100–03 (7th Cir.1982). However, the "Procedure" section contains, besides procedures, a long list of behaviors that warrant temporary barring and another long list of behaviors that warrant permanent barring. Mrs. Mayo argues that this specification of substantive criteria for exclusion from prison creates a property right of which she may not be deprived, consistently with the Fourteenth Amendment, without a hearing to determine whether she in fact engaged in any of the behaviors listed as grounds for permanently barring the visitor from all the state's prisons. She notes that the directive requires the prison system to conduct an annual review of permanent bar orders and notify the visitor of this annual review, and she alleges that no such notice was sent her—though this is hardly surprising, since her complaint was filed less than six months after the permanent bar was issued.

The state makes a variety of arguments in support of the district court's conclusion that the administrative directive is not a source of liberty or property within the meaning of the Fourteenth Amendment. We need not consider these arguments. Mrs. Mayo has no standing to argue that the directive was violated. As shown by its frequent references to "inmate visits" and by other language in the directive (e.g., "letter to the visitor with a copy to the inmate"), the directive regulates not visits to prisons as such—to see how the taxpayer's money is being spent or whether the conditions of confinement are horrendous—but visits to individual prison inmates. There is no indication that Mrs. Mayo wants to visit any inmate of the Illinois prison system, now that McCall–Bey has been released. She has no other relatives in prison, so far as appears—indeed, no friends or acquaintances in prison. There is no indication that the order permanently restricting her from access to Illinois state prisons has had the least effect on her. So far as one can tell, the last time she wanted to visit an inmate in an Illinois prison was on July 19, 1984—and she made that visit without interference. She wants to *have* the right to enter Illinois prisons, but there is no indication that she wants to *exercise* the right. She may feel offended by the order barring her from these prisons, but she does not argue that the order injures her beyond preventing visits that she has no desire to make; and indignation does not create standing. *ACLU v. City of St. Charles*, 794 F.2d 265, 268 (7th Cir.1986); *P.O.W.E.R. v. Thompson*, 727 F.2d 167, 171 (7th Cir.1984).

Mrs. Mayo argues that her status as an ordained minister gives her broader rights of visitation than other people. The argument is probably barred, as untimely; it is in any event irrelevant, since she does not contend that she wants to visit prison in connection with her religious vocation. She has no greater interest in challenging the order excluding her from Illinois prisons than a member of this panel would have, and that is not good enough. See, e.g., *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 225–26, 94 S.Ct. 2925, 2934–35, 41 L.Ed.2d 706 (1974); *D'Amico v. Schweiker*, 698 F.2d 903 (7th Cir.1983). She does not like the order, and may have reason not to; but unless she has been or is likely to be hurt by it in the sense of having suffered approximately the kind of loss that could support a common law action, she cannot sue—for reasons of judicial economy and prudence that are summarized in the words "case or controversy." The order she complains of may violate the Constitution but if it makes no difference in her conduct—if it neither affected her visit on July 19, 1984, nor will affect any other visiting plans of hers—then she lacks standing to challenge the order for purposes of obtaining either damages or an injunction. See, e.g., *Golden v.*

*Zwickler,* 394 U.S. 103, 109, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969); *United States v. Articles of Drug Consisting of 203 Paper Bags,* 818 F.2d 569, 572 (7th Cir.1987); *J.N.S., Inc. v. Indiana,* 712 F.2d 303, 305 (7th Cir.1983); *Haase v. Sessions,* 835 F.2d 902, 911 (D.C.Cir.1987).

The district judge was right to dismiss the complaint, although he should have done it on grounds of standing, that is to say on grounds of subject-matter jurisdiction, without reaching the merits. He had no power to reach the merits if, as we believe, the case is not within the judicial power of the United States as defined by Article III.

MODIFIED AND AFFIRMED.

FLAUM, Circuit Judge, concurring.

Plaintiff Elizabeth Mayo was permanently barred from visiting all Illinois adult correctional facilities following a visit she made to her grandnephew, Larry McCall-Bey, at the Dixon Correctional Facility. Ms. Mayo claims that in effectuating the permanent restriction, the Defendants deprived her of liberty without due process of law. According to the Plaintiff, Illinois statutory and regulatory provisions, as well as various constitutional provisions, give her a liberty interest in visiting Illinois correctional facilities. Since she was not given a hearing before she was barred from visiting the facilities, Ms. Mayo believes she was denied procedural due process and is therefore entitled to damages and injunctive and declaratory relief under Section 1983. The district court granted the Defendants' motion to dismiss holding that Ms. Mayo has no constitutionally protected liberty interest in visiting Illinois prisons. I would find that Ms. Mayo does have a liberty interest in prison visitation and also has standing to claim that she was deprived of that interest without due process. Nevertheless, because I would also find that Ms. Mayo has been given all of the process she was due upon restriction of her right to visit, I concur in the result reached by the majority.

I.

On July 19, 1984, Elizabeth Mayo travelled to the Dixon Correctional Facility to visit her grandnephew Larry McCall-Bey.[1] Ms. Mayo was accompanied on the trip by three minor children. According to prison officials, suspicions about these visitors were aroused when one of the minor children visited the women's bathroom without first signing in at the Officer Visiting Desk. A search of the bathroom immediately following the minor's visit turned up two plastic bags filled with marijuana. Based on that incident, and without giving Ms. Mayo any opportunity to rebut the charges against her, the prison officials permanently barred Ms. Mayo from all Illinois correctional facilities. Ms. Mayo was informed of this restriction in a letter from Warden Linda Geisen dated July 29, 1984. The letter did not inform Ms. Mayo that she had any right to have the decision reviewed by prison administration officials and, according to Ms. Mayo, no review of her permanent restriction has ever taken place.

Ms. Mayo's complaint alleges that she has been deprived of a liberty interest in prison visitation without due process of law in violation of the fourteenth amendment. Ms. Mayo claims she has a liberty interest by virtue of both a state statute, Chapter 38, paragraph 1003–7–2(f),[2] and an administrative directive promulgated by the Illinois

---

1. Larry McCall–Bey was at the Dixon Correctional Facility serving time for armed robbery. He was released from custody on December 21, 1984. There is no allegation that Ms. Mayo has any other relatives currently incarcerated in Illinois correctional facilities.

2. The statute states that:
   All of the institutions and facilities of the Department shall permit every committed person to receive visitors, except in case of abuse of the visiting privilege or when the chief administrative officer determines that such visiting would be harmful or dangerous to the security, safety or morale of the institution or facility. Clergy, religious chaplain and attorney visiting privileges shall be as broad as the security of the institution or facility will allow.
   Ill.Rev.Stat.1983, ch. 38 ¶ 1003–7–2(f).

Department of Corrections, No. 05.01.106.[3] However, the district court granted the prison officials' motion to dismiss holding that neither of these provisions give Ms. Mayo a liberty interest in visiting Illinois correctional facilities.

According to the district court, the statute does not create a liberty interest since, by its terms, it applies only to prisoners and not to visitors. The district court further held that the administrative directive does not create a liberty interest. That regulation was deemed to accord to prison officials the kind of wide-ranging discretion which defeats a claim that the state has created a liberty interest. Finally, the district court refused to decide whether the Plaintiff's alleged status as a minister afforded her rights under paragraph 1003-7-2(f) greater than those of the general populace as that status was mentioned for the first time only in the Plaintiff's reply brief to the motion to dismiss.

On appeal, the Plaintiff makes two arguments to support her claim that the district court erred in finding that she had no liberty interest in visiting Illinois correctional facilities. First, she contends that both the first and second sentences of paragraph 1003-7-2(f) give her a liberty interest. Second, she claims that Administrative Directive 05.01.106 creates a liberty interest in visitation by virtue of its mandatory language and specific substantive predicates for official action. In this circuit, we review these contentions bearing in mind that on an appeal from the grant of a motion to dismiss all allegations of the complaint must be taken as true. *Hanrahan v. Lane*, 747 F.2d 1137, 1138 (7th Cir. 1984). The dismissal of the complaint will be upheld only if "it appears that plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief." *Id.* at 1139.

## II.

There are two sources of the liberty interests protected by the due process clause of the fourteenth amendment. *Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864,

868, 74 L.Ed.2d 675 (1983). The first source of those interests is the due process clause itself. In this case, the Plaintiff makes no claim that the due process clause itself protects her right to visit Illinois prisons. In any event, as the majority recognizes, such a claim would be unavailing. The right to visit a prison is not the kind of fundamental interest protected by the due process clause. Every court which has addressed the issue has held that liberty interests do not arise when a person is barred from visiting a prison. *Robinson v. Palmer*, 619 F.Supp. 344, 349 (D.D.C.1985), *aff'd*, 841 F.2d 1151 (D.C.Cir.1988); *Fennell v. Carlson*, 466 F.Supp. 56, 59 (D.Okla. 1978); *White v. Keller*, 438 F.Supp. 110, 114 (D.Md.1977), *aff'd*, 588 F.2d 913 (4th Cir.1978).

The other source of the liberty interests protected by the fourteenth amendment is state law. For a state statutory or regulatory enactment to create a liberty interest, the enactment must use "explicitly mandatory language in connection with requiring specific substantive predicates." *Hewitt*, 459 U.S. at 472, 103 S.Ct. at 871; *see also Board of Pardons v. Allen*, 482 U.S. 369, 107 S.Ct. 2415, 2419-20, 96 L.Ed.2d 303 (1987) (state created liberty interest in parole through use of four designated justifications for denial [the substantive predicates] and mandatory language). The substantive predicates show " 'that particularized standards or criteria guide the State's decisionmakers.' " *Thompson v. Kentucky*, 833 F.2d 614, 619 (6th Cir.1987) (quoting *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 467, 101 S.Ct. 2460, 2466, 69 L.Ed.2d 158 (1981) (Brennan, J., concurring)), *cert. granted* — U.S. —, 108 S.Ct. 2869, 101 L.Ed.2d 905 (1988). No liberty interest is created if the state is free to make a decision for any constitutionally permissible reason or no reason at all. *Meachum v. Fano*, 427 U.S. 215, 228, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976).

The Supreme Court has extended this state created liberty analysis to the day-to-

---

**3.** See appendix for the text of the administrative directive.

day world of prison administration only with great hesitation. The Court has recognized that "the safe and efficient operation of a prison on a day-to-day basis has traditionally been entrusted to the expertise of prison officials." *Hewitt*, 459 U.S. at 470, 103 S.Ct. at 870 (citations omitted). Nevertheless, where a state enactment provides mandatory language in connection with substantive predicates, the Court has found that the enactment creates a liberty interest which requires prison administrators to afford due process to those who can validly claim the interest. *Id.*

### A.

In this case, the Plaintiff claims that two Illinois enactments create a liberty interest in prison visitation. The first is Illinois Revised Statute 1983, Chapter 38, paragraph 103-7-2(f) (the "statute") which states:

> All of the institutions and facilities of the department shall permit every committed person to receive visitors, except in case of abuse of the visiting privilege or when the chief administrative officer determines that such visiting would be harmful or dangerous to the security, safety or morale of the institution or facility. Clergy, religious chaplain and attorney visiting privileges shall be as broad as the security of the institution or facility will allow.

Plaintiff claims that the first part of the statute, while only mentioning the rights of prisoners, necessarily also applies to visitors. According to the Plaintiff, it would be inconsistent for the state to give prisoners a liberty interest in having visitors without there being a correlative liberty interest for visitors in visiting. I disagree. The basis of any claim to a state-created liberty interest is "a justifiable expectation" that the state will not act except in response to specified events. *Montanye v. Haymes*, 427 U.S. 236, 243, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976); *Vitek v. Jones*, 445 U.S. 480, 490, 100 S.Ct. 1254, 1262, 63 L.Ed.2d 552 (1980). Once there is such an expectation or reliance interest, a liberty interest is created to ensure that the

expectation is not "arbitrarily denied." *Board of Regents v. Roth*, 408 U.S. 564, 578, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Here, where visitor's rights are not even mentioned in the first part of the statute, no such legitimate expectation or reliance interest could have arisen.

The Plaintiff next contends that even if the first part of the statute does not apply to visitors, a visitor should be able to enforce the prisoner's right to receive visitors under a third-party rights theory. The general rule, where this sort of claim is raised, is that "one may not claim standing ... to vindicate the constitutional rights of some third party." *Barrows v. Jackson*, 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1953). Nevertheless, where "the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue, ..." and "there is some genuine obstacle" to the assertion of the right by the third party, then there is standing to attempt to vindicate the third party's rights. *Singleton v. Wulff*, 428 U.S. 106, 114-16, 96 S.Ct. 2868, 2874-75, 49 L.Ed.2d 826 (1976).

In this case, I would not reach the question of whether the Plaintiff's rights are "inextricably bound up" with those of the prisoner since it is plain that there was no obstacle to the prisoner asserting his own right. In fact, prisoners have successfully asserted their right to visitation under this very provision. *See United States ex rel. Adams v. O'Leary*, 659 F.Supp. 736 (N.D. Ill.1987) (prisoner has liberty interest under paragraph 1003-7-2(f) in having visitors). The Plaintiff has failed to establish that there are any significant impediments which would preclude prisoners from asserting their right to visitation.

Plaintiff has yet a third argument under the statute. She argues that the last sentence of the statute gives her, as an ordained minister, a liberty interest in visiting Illinois correctional facilities. I would not decide, however, whether the last sentence of the statute suffices to create a liberty interest in those persons to whom it applies for Plaintiff has waived this claim by failing to bring her status as a minister

to the attention of the district court in a timely fashion.

Plaintiff first alleged her status as a minister in her response to the Defendants' motion to dismiss. Nowhere in her complaint did the Plaintiff mention her ministerial status. While I recognize that the original complaint was filed *pro se,* and therefore must be read as liberally as possible, there is no excuse for the failure to attempt to amend the complaint following the appointment of counsel.[4] Plaintiff's allegations based on her status as a minister are thus waived. *See Rothwell Cotton Co. v. Rosenthal & Co.,* 827 F.2d 246, 249 n. 1 (7th Cir.1987) (argument raised for first time in opposition to motion for summary judgment and then ignored not preserved for appeal).

### B.

Plaintiff also claims that a liberty interest in visiting Illinois correctional facilities is created by Administrative Directive 05.-01.106 (the "AD") promulgated by the Illinois Department of Corrections.[5] The Plaintiff contends that the phrase "inappro-

priate behavior," when read in conjunction with the lists of actions resulting in either a temporary or permanent restriction from the correctional facilities, serves as the substantive predicate constraining the discretion of state decisionmakers. The district court held that the lists relied on by the Plaintiff contain certain phrases which are "sufficiently ambiguous so as to grant defendants broad discretion in controlling visitor access." *Mayo v. Lane,* slip. op. at 5 (N.D.Ill.1985). For example, the district court thought the phrase "disruptive conduct of a major nature" placed no substantive limits on official decisionmaking.

I disagree with the district court's conclusion that the phrase "disruptive conduct of a major nature" does not place substantive limits on official decisionmaking discretion. As the Plaintiff points out, the Supreme Court, in *Hewitt v. Helms,* held that the phrase "the threat of a serious disturbance" sufficed as a specific substantive predicate. 459 U.S. at 472, 103 S.Ct. at 871. I can perceive no meaningful distinction between the phrases "the threat of a serious disturbance" and "disruptive conduct of a major nature." Both phrases

---

**4.** Plaintiff filed a *pro se* complaint on January 14, 1985. On March 12, 1985, Michael P. Casey was appointed as counsel for the Plaintiff. The Defendant's motion to dismiss was not filed until June 28, 1985. The three and a half month period between the appointment of counsel and the motion to dismiss provided ample time in which the Plaintiff could have amended the complaint.

**5.** At oral argument the Defendant claimed that this administrative directive was nothing more than a policy of the Department of Corrections and thus lacked the force of law. In order for a regulation to create a liberty interest, that regulation must have the force of law. *Miller v. Henman,* 804 F.2d 421 (7th Cir.1986) (state regulations must have "binding force" in order to create liberty interests). Thus, in order to prevail, a plaintiff must, at some point, prove that the regulation which it claims creates the liberty interest has binding force on state actors.

It is difficult to evaluate this claim since neither the Plaintiff nor the Defendant briefed the issue and it appears that it was not raised before the district court. Moreover, it is not clear that we need to reach this issue given the ultimate disposition of the case. Nevertheless, a few comments are in order. First, in *Hewitt,* the Supreme Court found that a Pennsylvania ad-

ministrative directive did create a liberty interest in a prisoner. Thus, it is clear that at least *some* administrative directives do create liberty interests. Second, the regulation at issue here was adopted pursuant to paragraph 1003–7–1 of the Illinois Revised Statutes. That statute requires that the Department of Corrections promulgate rules and regulations to effectuate various prison related statutes. Illinois law holds that "[h]aving once established rules pursuant to statutory authority, an administrative agency is *bound* by these rules and may not violate them." *Hetzer v. State Police Merit Board,* 49 Ill.App.3d 1045, 8 Ill.Dec. 23, 25, 365 N.E.2d 261, 263 (1977) (emphasis added). Thus, since AD 05.01.106 was established pursuant to statutory authority, the Department of Corrections is bound, under Illinois law, to follow the directive. Finally, the AD has recently been "revised and recodified," Defendant's Supplemental Brief at 6 n. 2, in the Illinois Administrative Code at Chapter 20, Section 525.60. If the new regulation, which apparently was promulgated through the procedures of the Illinois Administrative Procedure Act and thus has binding force, is nothing more than a recodification of the original provision, then it would seem that the original must also have had binding force. In sum, although we need not reach the issue, the administrative directive at issue in this case probably did have binding force.

require prison officials to make subjective judgments as to the nature of the activity that has taken place or will take place in the future. The use of subjective criteria, however, "is not incompatible with the existence of a liberty interest." *Board of Pardons v. Allen*, 482 U.S. 369, 107 S.Ct. 2415, 2419, 96 L.Ed.2d 303 (1987); *See also Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 10, 99 S.Ct. 2100, 2105, 60 L.Ed.2d 668 (1979).

The Defendants argue that the AD does not place real limits on the discretion of prison officials because the AD only states that the listed activities "could" result in temporary or permanent visiting restrictions. Thus, the Defendants claim that the lists are non-exclusive and leave open the possibility of restricting visitation for any reason or no reason at all. That is a very strained reading of the AD. A more appropriate reading would be that prison officials "could" restrict visitation if one of the activities on the list has occurred, but they are not forced to do so. *Compare Stokes v. Fair*, 795 F.2d 235, 237–38 (1st Cir.1986) (liberty interest found in staying out of administrative segregation where statute prescribed four situations in which a prisoner "may" be placed there; court held that "while officials have the ultimate discretion to segregate the inmates, segregation is permissible only when one of the specific situations exist") *with Culbert v. Young*, 834 F.2d 624, 628 (7th Cir.1987) (no liberty interest where statute states that the decisionmakers "should" consider certain criteria).

The Defendant's final attack on the administrative directive comes in the form of a syllogism. First, the Defendant correctly recognizes that procedures standing alone cannot create liberty interests. *See Shango v. Jurich*, 681 F.2d 1091, 1100 (7th Cir. 1982). The Defendant next points out that the lists of activities contained in the Administrative Directive are found in the "Procedures" section of the regulation. Thus, the Defendant contends that because the lists of activities are contained in the procedures section of the directive, they cannot form the substantive predicates necessary to create a liberty interest. The problem with this argument is that the placement of the substantive predicates is unimportant. So long as the regulation sets out specific grounds upon which a state official can act, regardless of the placement of the language in the regulation, the substantive predicate requirement has been met. In this case, the regulation states that "visitors who demonstrate inappropriate behavior" will be restricted from institutional visits, and then goes on to list in detail those activities considered to be inappropriate behavior. Taken in combination, this language shows that the state has created specific substantive predicates for official action.

*Hewitt* emphasizes that more than just substantive predicates are necessary before a state created liberty interest may be found. There must also be "the repeated use of explicitly mandatory language." 459 U.S. at 473, 103 S.Ct. at 872. Defendants claim that this requirement is absent from the AD because the mandatory language contained in the directive is not used in a way which would justify a person in believing that he or she has a right to visit the prison. I disagree.

In *Hewitt*, the statute required that "an investigation *shall*" begin immediately following the disciplinary action. 459 U.S. at 471, 103 S.Ct. at 871 (emphasis added). The statute also stated that the inmate "*shall* be notified in writing" as soon as possible following the disciplinary action. *Id.* (emphasis added). Finally, the statute stated that the "inmate *must* be released as soon as the reason for the security concern has abated but in all cases within ten days." *Id.* (emphasis added). This use of mandatory language by Pennsylvania convinced the Supreme Court that the state intended to make the substantive predicates binding.

The Illinois AD at issue in this case contains mandatory language which closely parallels the language of the statute at issue in *Hewitt*. AD 05.01.106 requires that any witnesses to an incident involving a visitor "*shall* immediately prepare an Incident Report." (emphasis added). The Chief Administrative Officer then must re-

view the report and *"shall* determine whether the incident will result in a written warning or a temporary or permanent restriction." (emphasis added). After making the determination, the Officer *"shall* (or *will*) prepare a letter to the visitor." (emphasis added). Finally, the AD requires that any permanent restrictions *"shall* be automatically reviewed by the Chief Administrative Officer" one year after the restriction and every twelve months thereafter until it is lifted. (emphasis added).

Thus, just as in *Hewitt,* the state has "used language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed." 459 U.S. at 471, 103 S.Ct. at 871. Where the state has used such language and has also furnished the state decisionmakers with substantive criteria upon which to base their decision, the state has created a liberty interest in prison visitation.

The conclusion that the state has created a liberty interest is not one I reach with complete equanimity. I recognize that in the great run of cases the deference we owe to the "informed discretion of prison administrators permits them, and not the courts, to make the difficult judgments concerning institutional operations...." *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977). Absent the Administrative Directive, I have no doubt that decisions as to prison visitation could be handled effectively by prison administrators without any sort of oversight by the federal courts. Nevertheless, because Illinois has created a set of criteria for the withdrawal of visitation privileges, and has joined those criteria with mandatory language, I believe that Illinois has established a limited liberty interest in visitation that can only be restricted with adherence to due process.[6]

Still, the liberty interest created by the AD cannot serve as an unlimited pass giving every person who so desires the right to visit Illinois prisons. In order to have a

liberty interest, the visitor must be able to show that there is a prisoner who has the ability and desire to have the person visit. Thus, if the visitation rights of Ms. Mayo's grandnephew had been legitimately restricted at the time of the desired visit by Ms. Mayo, no liberty interest would have arisen. Similarly, if Ms. Mayo's grandnephew for some reason did not want her to visit, Ms. Mayo would not be able to claim a liberty interest in that particular visit. It is in this sense that the AD creates only a *limited* liberty interest in visiting Illinois correctional facilities.

The majority does not reach these issues but instead holds that Ms. Mayo has no standing to bring this claim because there is no evidence that she ever desired to visit her grandnephew in the period between her restriction and his release. I find two problems with the majority's analysis. First, there is evidence that Ms. Mayo wanted to visit her grandnephew while he was incarcerated. The complaint giving rise to this action, although not filed until January 14, 1985, was first received, apparently erroneously, by the United States Attorney's office on November 9, 1984, over a month before Mr. McCall–Bey was released. It is hard to conceive of any stronger procedural action Ms. Mayo could have taken to evidence her desire to visit than drawing up this complaint. Second, this is not a case, as the majority believes, in which a person whose rights have been violated is uninjured because she is unaware of the violation. Ms. Mayo received a letter from Warden Geisen informing her that she was permanently restricted from visiting Illinois correctional facilities. At that point, Ms. Mayo was not in the position of a "person who is in a room locked from the outside but does not know the room is locked and does not attempt to leave during the time it is locked." Instead, I believe Ms. Mayo is in the position of one who knows the door is locked and does not make the meaningless gesture of knocking on the door when she knows there will be no response. Thus, I believe

**6.** Because I find that the AD created a liberty interest in prison visitation I need not, and do not, reach the issues of whether Ms. Mayo had a

liberty interest in prison visitation by virtue of her familial right of privacy or any stigma that may have resulted from the Defendants' actions.

Ms. Mayo does have standing to claim that she is entitled to relief from the state officials who restricted her right to visit Illinois prisons.[7]

### III.

If it can be concluded that the AD does create a limited liberty interest in visitation, and that this Plaintiff has standing to assert that interest, the next issue is whether the state provided the Plaintiff with due process in depriving her of the interest. It must be kept in mind that due process is not an inflexible requirement but should be molded and varied to fit the circumstances. *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976); *Hewitt v. Helms,* 459 U.S. 460, 473, 103 S.Ct. 864, 872, 74 L.Ed.2d 675 (1983). This is particularly true in the area of prisons where "the particular due process protections are limited by the need to pursue legitimate correctional goals." *Williams v. Lane,* 851 F.2d 867, 880 (7th Cir.1988). "Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979); *Mendoza v. Miller,* 779 F.2d 1287, 1292 (7th Cir.1985). It must also be recognized, however, that the "bitter with the sweet" theory of due process has been rejected by the Supreme Court and therefore one must look to federal law to determine the adequacy of the state's procedures. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492–93, 84 L.Ed.2d 494 (1985).

To determine whether the state has, as they claim, afforded Ms. Mayo all the process she was due, a balancing test should be employed. *Mathews,* 424 U.S. at 335, 96 S.Ct. at 903. This test requires consideration of three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.*

In this case, the first factor, the private interest, is not one of overwhelming significance. While it should be recognized that the ability to visit loved ones who are incarcerated is important, the loss of visitation rights is mitigated by the ability to communicate with the prisoner by phone or through the mails. This is not a case where loss of liberty means confinement or the possibility of longer confinement. *Compare Hewitt,* 459 U.S. at 464, 473, 103 S.Ct. at 872 (only informal non-adversary review required where prisoner merely transferred from one restrictive environment to another) *with Wolff v. McDonnell,* 418 U.S. 539, 564, 94 S.Ct. 2963, 2978–79, 41 L.Ed.2d 935 (1974) (more formal procedures required where inmate faces loss of good-time credits).

To assess the second factor, the risk of error and the value of additional safeguards, one must first review the actual procedures required by the AD. Before a person's visitation rights are restricted, a report is filed by a witness (or witnesses) to the alleged incident. Following that report, the Chief Administrative Officer, or his or her designee, makes a decision, based on the report, on whether to restrict

---

7. The majority is correct in holding that, following the release of her grandnephew, Ms. Mayo does not have standing to request injunctive or declaratory relief. That, in fact, is the teaching of the cases cited by the majority for the proposition that Ms. Mayo lacks standing. *See Golden v. Zwickler,* 394 U.S. 103, 108–09, 89 S.Ct. 956, 959–60, 22 L.Ed.2d 113 (1969) (declaratory relief); *United States v. Articles of Drug Consist-* *ing of 203 Paper Bags,* 818 F.2d 569, 570 (7th Cir.1987) (validity of agency action); *J.N.S., Inc. v. State of Indiana,* 712 F.2d 303, 304 (7th Cir. 1983) (declaratory and injunctive relief); *Haase v. Sessions,* 835 F.2d 902, 903 (D.C.Cir.1987) (declaratory relief). None of the cases cited by the majority deal with a situation such as this where money damages were among the remedies requested.

the person's visitation rights. If a person's visitation rights are permanently restricted, the state gives that person notice that he or she may have the decision reviewed after the passage of six months. One assumes that when that review occurs, or at the very least when the first automatic review occurs after twelve months, the state allows the restricted person to present his or her side of the story either in writing or in person. If the six month review does not result in the restriction being lifted, the restriction is automatically reviewed every twelve months until it is removed.

There is obviously some risk of error in a procedure which does not allow for the calling of witnesses, cross-examination and other formal procedures. This risk is magnified by the fact that the Plaintiff's first opportunity to rebut the charges does not come until six months after the restriction is imposed. It is also apparent that the probable value, in terms of reaching the correct result, of requiring additional safeguards is fairly high. Nevertheless, I find that, given the enormous cost that would be associated with additional procedures, the state's current system of procedures does fulfill the requirements of due process of law.

As pointed out above, the preeminent concern of the prison system is with the safety of its penal institutions. "The safety of the institution's guards and inmates is perhaps the most fundamental responsibility of prison administration." *Hewitt,* 459 U.S. at 473, 103 S.Ct. at 872. This interest in maintaining absolute security justifies the state in not affording a visitor suspected of wrongdoing a hearing prior to restricting the visitor's rights. Moreover, requiring the state to afford any sort of formal hearing to the restricted visitor would undoubtedly entail a great expenditure of the scarce time and resources available to already harried prison administrators. While I recognize that the state waits six months after the restriction before affording the restricted visitor any

sort of hearing, this lapse is not so unreasonable, at least in the context of a penitentiary, where the minimum term of confinement is one year, as to amount to a violation of due process.[8] *See U.S. v. Eight Thousand Eight Hundred and Fifty Dollars ($8,850),* 461 U.S. 555, 569, 103 S.Ct. 2005, 2014, 76 L.Ed.2d 143 (1983) (ultimate inquiry in determination of whether delay violates due process is whether the delay was "reasonable").

The Supreme Court has recognized that an informal, nonadversarial review of the evidence supporting a restriction on liberty can sometimes fulfill the requirements of due process in the prison setting. *Hewitt,* 459 U.S. at 472, 103 S.Ct. at 871–72. In *Hewitt,* the Court held that Pennsylvania statutes and regulations gave prisoners a liberty interest in avoiding administrative segregation. *Id.* In deciding what process was due before the prisoners could be placed in segregation, the Court noted the safety concerns endemic to prison life and the need for deference to prison administrators in their attempts to deal with those concerns. *Id.* The Court then stated that "[t]hese considerations convince us that petitioners were obligated to engage only in an informal review of the information supporting respondent's administrative confinement, including whatever statement respondent wished to submit, within a reasonable time after confining him to administrative segregation." *Id.* The Court also noted the importance of "periodic review" to ensure that if circumstances changed, the appropriate action would be taken. *Id.,* 459 U.S. at 478 n. 9, 103 S.Ct. at 874 n. 9.

I believe that the state gives visitors who have their visitation rights restricted due process where the visitor is given notice of the charges against him, including a description of the evidence supporting the charge, an opportunity to present evidence, an initial review by an unbiased decisionmaker and periodic reviews thereafter.

In this case, the Defendants provided the Plaintiff with all of the process she was due. The Plaintiff admits that she was

---

8. The length of the delay would be more troubling in the county jail context where a six month delay would encompass all or most of the prisoner's period of incarceration.

promptly told the extent of and reasons for her restriction. The Plaintiff contends, however, that she was deprived of due process because she was never given a hearing to rebut the charges against her. But in the unique factual situation of this case, the state never became obligated to give her a hearing. As I detailed above, the state was not obligated to give the Plaintiff a hearing until six months following her restriction. By the time the six months had run in this case, the Plaintiff could no longer claim the liberty interest since her grandnephew, the only person she wanted to visit, was no longer in prison. Thus, the state was not required to provide a hearing to Ms. Mayo, since she no longer had the right which that hearing would have protected, and the state did not deprive her of a liberty interest without due process.[9]

Accordingly, I would affirm the district court's decision to dismiss this case, albeit on different grounds.

*Appendix*

Administrative Directive 05.01.106

I. *Policy*

A. *Authority*

Ill.Rev.Stat., Ch. 38, Section 1003–7–2

B. *Policy Statement*

In order to preserve the security of the facility, visitor access shall be carefully controlled.

1. Visitors who demonstrate inappropriate behavior will be temporarily or permanently restricted from institutional visits.

2. Employees or former employees who have been involved with an inmate(s) may be permanently restricted from institutional visits.

II. *Procedure*

A. *Purpose*

The Chief Administrative Officer at each correctional facility shall ensure that a procedure has been established for properly noting any inappropriate behavior by visitors to the facility and that consideration is then given to restricting future visits on a temporary or permanent basis, depending upon the severity of the incident.

B. *Applicability*

This directive is applicable to all the correctional facilities within the Adult, Juvenile and Community Services Divisions.

C. *Definitions*

1. Temporary restriction—a restriction of a visitor for up to six months.

2. Permanent restriction—a restriction of a visitor for an indefinite period of time, allowing an automatic review process for possible future restoration.

D. *General Provisions*

1. The Deputy Directors of the Adult, Juvenile and Community Sevices Divisions shall prepare and distribute a master roster of visitor restrictions to all facilities within the appropriate division. This information will be shared with the Deputy Directors of the other operating divisions.

2. Any visitor restricted from inmate visits at one facility shall also be restricted from inmate visits at all other facilities within the appropriate division.

E. *Requirements*

1. Any of the following actions on the part of the visitor could result in *tem-*

---

9. This is not the same as saying that Ms. Mayo has no standing to bring a procedural due process claim. A quick example will show that Ms. Mayo does have standing to bring the claim. Suppose it was held that the the Due Process Clause requires that a visitor whose visitation rights are restricted must be given a hearing within ten days of the restriction. If that were true, then Ms. Mayo would be entitled to damages since the state, in this case, did not give Ms.

Mayo a hearing within that ten day period. The only difference between the example and the actual case is the time limit for a hearing. To decide that time limit, however, we necessarily have to reach the merits of the Plaintiff's due process claim. It is only after we reach the merits and decide that six months is the outer limit, that we can say that, on the facts of this case, Plaintiff has not been deprived of due process.

*porary restriction* from all correctional facilities within the division.

a. Disruptive conduct of a minor nature.

b. Disobeying an order or posted rule.

c. Refusal to submit to search.

d. Possession of drugs with no apparent intent to conceal or introduce into the facility.

e. Possession of alcohol with no apparent intent to conceal or introduce into the facility.

f. Being under the influence of alcohol or drugs.

g. Possession of other contraband not specifically outlined in this directive (*e.g.* clothing, jewelry).

2. Any of the following actions on the part of a visitor could result in *permanent restriction* from all correctional facilities within the division.

a. Assaultive behavior on any individual (*e.g.* physical assault, verbal threat to do bodily harm).

b. Sexual misconduct (e.g. sexual intercourse, masturbation, fondling of genitals).

c. Possession of weapons (e.g. guns, knife, bullets).

d. Possession of drugs or drug paraphenalia with intent to conceal and/or introduce into facility.

e. Possession of money with intent to conceal and/or introduce into facility.

f. Possession of escape paraphenalia.

g. Possession of alcohol with intent to conceal and/or to introduce into facility.

h. Providing false identification or information.

i. Disruptive conduct of a major nature.

j. Arrest and/or conviction for any action committed during a visit.

k. Any recurrence of an action that previously resulted in a temporary restriction.

3. An employee who has been involved with an inmate or a former employee who has either resigned or been terminated as a result of involvement with an inmate, may be permanently restricted from institutional visits.

4. If contraband is discovered in the possession of an inmate either during or after a visit, it will be assumed that the contraband was introduced by the inmate's visitor(s).

5. If any inappropriate behavior is observed by an employee during a visit, he will immediately notify the Shift Supervisor who will terminate the visit and ensure that the visitor(s) is escorted out of the facility.

6. The reporting employee, Shift Supervisor and any other employee who witnessed the incident shall immediately prepare an Incident report fully outlining the exact details. In addition, the Shift Supervisor will contact the Assistant Warden of Operations for the Adult Division, Chief Administrative Officer or his designee for the Juvenile Division or the Assistant Supervisor for the Community Services Division, who will issue a temporary stop order on the visitor(s).

7. After a careful review of all the written reports, the Chief Administrative Officer or his designee shall determine whether the incident will result in a written warning or a temporary or a permanent restriction.

a. If it is determined that a written warning will suffice, the Chief Administrative Officer or his designee shall prepare a letter to the visitor with a copy to the inmate, outlining the incident and indicating that any future occurrences may result in either a temporary or permanent visiting restriction.

b. If it is determined that a temporary restriction is warranted, the Chief Administrative Officer or his designee shall prepare a letter to the visitor, with a copy to the inmate, outlining the incident and indicating the exact length of the temporary restriction. This notification will specifically indicate that the temporary restriction is for all correctional facilities within the division.

c. If it is determined that a permanent restriction is in order, the Chief Administrative Officer, or his designee, will prepare a letter to the visitor, with a copy to the inmate, outlining the incident and indicating that the visitor is being permanently restricted from all correctional facilities within the division. This notification will indicate that, while the restriction is permanent in nature, the visitor may request that the Chief Administrative Officer review the restriction after a six month period.

8. All permanent restrictions shall be automatically reviewed by the Chief Administrative Officer, or his designee, one year from the date of the restriction and, if denied, every twelve months thereafter. Notification of this annual review will be sent to the visitor, with a copy to the inmate indicating the result of the review.

9. The Chief Administrative Officer shall have the authority to restore visiting privileges at any time he deems appropriate.

10. The Chief Administrative Officer shall ensure that a list of all new visitor restrictions and reinstatements will be sent to the Deputy Director of the appropriate division on a monthly basis to be included on the new master roster for visitor restrictions. This list must include:

a. The name and home address of each visitor restricted and the type of restriction.

b. The name and address of each visitor who has had their visiting rights restored and the type of previous restriction.

11. The Chief Administrative Officer shall ensure that the master roster of visitor restrictions is checked prior to inmate visits. Any visitor who has been restricted from one facility within the division shall be restricted from all facilities within a division. A restricted visitor shall not enter the facility without written approval of the Chief Administrative Officer.